UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHELLE BROWN, | ) | CASE NO. 1:14CV2410 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | Magistrate Judge George J. Limbert |
| | ) | |
| CAROLYN W. COLVIN[1], | ) | |
| ACTING COMMISSIONER OF SOCIAL | ) | REPORT AND RECOMMENDATION |
| SECURITY ADMINISTRATION, | ) | OF MAGISTRATE JUDGE |
| | ) | |
| Defendant. | ) | |

Plaintiff Michelle Brown ("Plaintiff") requests judicial review of the final decision of the Commissioner of the Social Security Administration ("Defendant") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  ECF Dkt. #1. Plaintiff asserts that substantial evidence does not support the administrative law judge's ("ALJ") decision finding that her impairments do not meet or equal Listing 1.02A ("Listing 1.02A") of 20 C.F.R. § 404, Subpart P, Appendix 1 ("The Listings") and the ALJ failed to properly apply the treating physician rule to the opinions of Dr. Kravanya.  ECF Dkt. #14.

For the following reasons, the undersigned RECOMMENDS that the Court AFFIRM the ALJ's decision and dismiss the instant case with prejudice.

## I.  PROCEDURAL HISTORY

On March 24, 2011, Plaintiff filed applications for DIB and SSI alleging disability beginning July 7, 2007 due to degenerative arthritis in her knees, right ankle, left toe and left rotator cuff, high blood pressure and sleep apnea.  ECF Dkt. #9 ("Tr.") at 201, 208, 228, 236.[2]  The

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

[2]All citations to the Transcript refer to the page numbers assigned when the transcript was filed in the CM/ECI system rather than the page numbers assigned when the transcript was compiled.  This allows the Court to easily reference the Transcript as the page numbers of the .PDF file containing the transcript correspond to the page numbers assigned when the transcript was filed in the CM/ECI system.

Social Security Administration ("SSA") denied Plaintiff's applications initially and upon reconsideration. *Id.* at 100-168. Plaintiff then requested a hearing before an ALJ, and her hearing was held on December 18, 2012. *Id.* at 49-82.

On May 24, 2013, the ALJ issued a decision denying Plaintiff's applications for DIB and SSI. Tr. at 31-43.    On October 30, 2014, Plaintiff filed the instant suit seeking review of the ALJ's decision. ECF Dkt. #1. Plaintiff filed a brief on the merits on March 30, 2015, asserting the following assignments of error:

> 1.     Whether substantial evidence demonstrates that Plaintiff's severe impairments meet, or at least equal, Listing 20 CFR Part 404, Subpart P, Appendix 1, Listing 1.02A.
>
> 2.     Whether the Administrative Law Judge erred in failing to grant appropriate weight to the opinions of the treating physician, Dr. Kravanya.

ECF Dkt. #14. On June 11, 2015, Defendant filed a response brief. ECF Dkt. #17.

## II.     RELEVANT MEDICAL AND TESTIMONIAL EVIDENCE

### A.     MEDICAL EVIDENCE

On November 24, 2010, Plaintiff presented to Dr. Beecher, an orthopedic doctor, for her complaints of bilateral knee osteoarthritis and bilateral foot pain. Tr. at 432. He noted that she had been seen in past for these same complaints and refused injections in the past. *Id.* Plaintiff requested more Motrin for the pain and indicated that she recently tried Naproxen but had an allergy to it. *Id.* She also indicated that she ate well but did not exercise and used a cane to walk. *Id.* Plaintiff requested that Dr. Beecher complete a functional capacity assessment, but he indicated that she had to go to physical medicine and rehabilitation for its completion. *Id.* He diagnosed lower leg osteoarthritis and prescribed Motrin 800 mg. *Id.* at 431-434.

On January 13, 2011, Plaintiff presented to Dr. Haddad complaining of weight gain and worsening osteoarthritis in her lower extremities. Tr. at 358. She indicated that an orthopedic doctor evaluated her lower extremity pains and offered injections, but she declined. *Id.* She requested an appointment with nutrition to help with her weight gain. *Id.* Dr. Haddad diagnosed lower leg osteoarthritis exacerbated by recent weight gain, and she told Plaintiff to continue taking the nonsteroidal anti-inflammatory drugs ("NSAIDS") prescribed. *Id.* Dr. Haddad also prescribed

Ibuprofen 800MG.  *Id*.  Dr. Haddad further diagnosed OSA, but indicated that Plaintiff noticed a big improvement on the CPAP, although she did have some nasal irritation for which Dr. Haddad advised her to start saline drops.  *Id*. at 359. Dr. Haddad also diagnosed: stable hypertension; obesity; for which she counseled Plaintiff and prescribed service to the nutrition department; and dyslipidemia, for which Plaintiff was taking a statin.  *Id.* at 360.

On February 15, 2011, Plaintiff presented to Certified Nurse Practitioner ("CNP") Steinel for follow up for her OSA. Tr. at 352.  CNP noted that Plaintiff had morbid obesity at 300 pounds and a height of 5 feet, 3 inches, and she had severe OSA that was responding to CPAP at 12.  *Id*. It was noted that Plaintiff reported using the CPAP every night but was having post nasal discharge and nasal burning.  *Id*.

On March 7, 2011, Plaintiff presented to the emergency room complaining of shortness of breath.  Tr. at 341.  Her prior medical history included diagnoses of obesity, hypertension, knee osteoarthritis, hyperlipidemia and obstructive sleep apnea ("OSA").  *Id*. at 343.  Plaintiff related that after breakfast, she felt like she could not catch her breath.  *Id*.  It was noted that she had a CPAP at night but was not compliant.  *Id*. Plaintiff noted that she had prior similar episodes in the past which was what prompted her evaluation and diagnosis with OSA in the first place.  *Id*. Testing and physical examination showed no abnormalities and her strength and gait were normal. *Id*.  She was diagnosed with a single, self-limiting episode of shortness of breath. *Id*. at 344.  The physician suspected that the shortness of breath was related to her OSA and noncompliance with the CPAP and Plaintiff was told to start complying with the CPAP and to follow up with her primary care physician.  *Id*.

Notes from Plaintiff's primary care physician, Dr. Kravanya dated September 23, 2011 indicate that Plaintiff's weight was 280 pounds and she was complaining of severe knee and foot pain on the right.  Tr. at 492.  She also complained of shortness of breath, difficulty sleeping and crying easily.  *Id.*  Physical examination revealed decreased breath sounds, decreased pinprick lateral left thigh, positive edema on the bilateral knees, crepitus in the knees, decreased range of motion and positive heel and plantar pain.  *Id.*  She diagnosed degenerative osteoarthritis in the bilateral knees, unstable hypertension, depression secondary to Plaintiff's physical condition and

she prescribed medications for Plaintiff and ordered x-rays of Plaintiff's bilateral knees and her right foot.  *Id*.

On October 1, 2011, x-rays of Plaintiff's right foot showed a plantar calcaneal heel spur and joint space narrowing involving the first metatarsophalangeal joint, but no fracture or dislocation.  Tr. at 465-466.  X-rays of Plaintiff's right and left knees showed lateral subluxation and osteophytes involving the medial and lateral femoral condyles and tibial plateau.  *Id*. at 466-468.  The impression was degenerative changes of the right knee.  *Id*.  X-rays of the left knee showed moderate to severe joint space narrowing of the medical compartment of the left knee with associated osteophyte formation involving the medial and lateral from condyles and medical and lateral tibial plateau, with ostephytes also involving the superior and inferior poles of the patella.  *Id*.  The impression was left knee osteoarthritis.  *Id*. at 468.

On October 11, 2011, Dr. Kravanya ordered x-rays of Plaintiff's shoulders due to her complaints of pain and the x-rays showed mild degenerative changes in the bilateral acrioclavicular joints.  Tr. at 461-462.

On December 9, 2011, Dr. Kravanya's medical notes show that Plaintiff presented with continued pain in her knees with stiffness and an inability to bend over and to sit or stand for sustained periods of time.  Tr. at 494.  She also complained of back pain and her use of the CPAP machine.  *Id*.  Dr. Kravanya noted that Plaintiff was unable to stand upright at the appointment and she was using a cane for ambulation.  *Id*.  Physical examination revealed decreased flexion and extension and Dr. Kravanya indicated that Plaintiff felt helplessness, anxiety and depression because she was unable to perform daily lifestyle activities for herself.  *Id*.  Dr. Kravanya diagnosed degenerative osteoarthritis of the lumbar spine, knees and shoulders, unstable hypertension, sleep disorder, depression and anxiety, fatigue/malaise, and acute lumbago.  *Id*. at 495.  She prescribed Plaintiff a Medprol dosepak.  *Id*.

On December 23, 2011, Plaintiff presented to Dr. Kravanya complaining of continuing pain in her lumbar spine and the Medrol dosepak gave her slight improvement in her range of motion.  Tr. at 495.  A lumbar spine x-ray was ordered.  *Id*.  Dr. Kravanya prescribed a disability placard for Plaintiff for life.  *Id.* at 510.

-4-

On December 31, 2011,the lumbar x-rays ordered by Dr. Kravanya showed disc space narrowing at L3-L4, L4-L5, L5-S1, osteophyte formation, and facet sclerosis.  Tr. at 488.  The impression was osteoarthritis.  *Id*.

Dr. Kravanya examined Plaintiff on January 6, 2012 and Plaintiff complained of severe knee pain in both knees with positive swelling in both knees and indicated that she could hardly walk from room to room.  Tr. at 496.  Edema was noted and Plaintiff was crying and emotional because she was unable to obtain employment due to her arthritis and weight issues.  *Id*. at 497.  Plaintiff's Paxil prescription was continued and Lasix was prescribed as well.  *Id*.

On February 24, 2012, Dr. Kravanya wrote a "To Whom It May Concern" letter indicating that she has treated Plaintiff since December of 1996 for several medical conditions, including her advancing degenerative osteoarthritis.  Tr. at 489.  Dr. Kravanya noted that Plaintiff has required the use of a cane for the past two years and her arthritis was in her bilateral shoulders, bilateral knees, her spine and her feet.  *Id.*  Dr. Kravanya indicated that Plaintiff could not maintain her personal needs on her own, as she could not bend over to put on her shoes and socks and required her husband to help her bathe and dress her.  *Id*.  Dr. Kravanya opined that Plaintiff could not tolerate sustained positions of sitting, standing, walking or sleeping positions and she could sit for only thirty minutes, walk or stand for only five to ten minutes as she experiences high levels of pain and stiffness of the involved joints.  *Id*.  Dr. Kravanya also concluded that Plaintiff's obesity complicated her medical conditions and explained that Plaintiff had gone from 240 pounds to 289 pounds in the last five years because of her inability to ambulate for any period of time and her inability to exercise.  *Id*.  Dr. Kravanya opined that Plaintiff was not a qualified candidate for employment.  *Id*.

March 6, 2012 x-rays of Plaintiff's hips ordered by Dr. Kravanya showed no evidence of osseous, articular or soft tissue abnormalities.  Tr. at 514-515.

On April 23, 2012, Dr. Kravanya referred Plaintiff to Dr. Miskovsky, an orthopedic doctor, for her complaints of bilateral foot pain that was worse on the right than the left.  Tr. at 517.  It was noted that Plaintiff had lost 60 pounds and was working with a nutritionist.  *Id*.  Upon examination, Dr. Miskovsky noted that Plaintiff was 5 feet, 3 inches tall and weighed 270 pounds, she had light

touch sensation that was intact over her peripheral nerve distribution in both lower extremities, no edema was noted, there was an increased hindfoot valgus a bit on the right compared to the left, and a flexible early grade 2 deformity, adult-onset flatfoot deformity on the right, soreness over the planta fascia which was worse on the right, and tightness of the Achilles tendon bilaterally and mild spur formation over the left great toe distally with no significant pain. *Id.* at 517.

Dr. Miskovsky reviewed Plaintiff's foot x-rays as well and diagnosed symptomatic pes planus, right worse than the left, early grade 2 adult-onset flatfoot deformity of the right foot and ankle, mild plantar fascitis of the right foot and ankle, and minimal hallux rigidus of asymptomatic left great toe. Tr. at 518. Dr. Miskovsky recommended that Plaintiff continue to lose weight and she prescribed custom-made orthotics which she deemed medically necessary. *Id.* She also recommended a short Cam walker boot due to the amount of pain that Plaintiff had in her right foot and the plantar fascia with inflammation. *Id.* She instructed Plaintiff to wear the boot for the next 3 weeks when she stood or walked and then she could transition into the orthotics. *Id.* Dr. Miskovsky also recommended a stretching program for Plaintiff's plantar fascitis, physical therapy, and continued taking of Ibuprofen as needed. *Id.*

Also on April 23, 2012, Dr. Victoroff, another orthopedic doctor, evaluated Plaintiff's complaints of shoulder pain. Tr. at 520. Physical examination revealed that Plaintiff was quite overweight, but she had active range of motion, but pain on passive abduction, forward flexion and pain at the extremes of range of motion in both shoulders, more on the right than the left. *Id.* She had normal power and he reviewed her x-rays as well. *Id.* Dr. Victoroff diagnosed bilateral subacromial impingement and he recommended injections, which Plaintiff refused. *Id.* He prescribed a Medrol dosepak and physical therapy. *Id.*

On April 24, 2012, Dr. Fitzgerald, an orthopedic doctor, examined Plaintiff for her bilateral knee pain. Tr. at 527. Plaintiff rated her knee pain as a 10/10. *Id.* Physical examination showed that Plaintiff had an antalgic gait and had a "decent" range of motion, with mild bilateral effusions and diffuse tenderness to palpation along the joint line bilaterally. *Id.* She also had a positive patellar grind, but had full knee extension and negative straight leg raise and nontender to palpation over her trochanter and no pain in her groin or hips. *Id.* Dr. Fitzgerald reviewed Plaintiff's x-rays

that he had ordered and he diagnosed bilateral knee osteoarthritis.  *Id.* at 527, 53-536.  He discussed with Plaintiff her weight loss and continued weight loss, activity modification, bracing, injections and eventually a total knee arthroplasty.  *Id.*  Plaintiff indicated that she was not interested in surgery at the present time, although Dr. Fitzgerald noted that eventually Plaintiff would require a total knee arthroplasty.  *Id.*  Plaintiff also refused a corticosteroid injection and Dr. Fitzgerald stressed that Plaintiff really needed to lose as much weight as possible.  *Id.*

Also on April 24, 2012, Plaintiff consulted with Dr. Eubenks, Chief of Spine Surgery at the Department of Orthopedics at University Hospitals Geauga Medical Center.  Tr. at 534.  He wrote a letter to Dr. Kravanya indicating that he evaluated Plaintiff for her constant low back pain.  Id. at 533.  Upon physical examination, he noted that she had no pain with range of motion of her hips, she had a normal neurologic exam, full strength in her lower extremities, and negative straight leg raising.  *Id*.  He reviewed imaging test results which showed a degenerative L4-L5 disc.  *Id*.  Dr. Eubenks explained that he told Plaintiff about the natural history of disc degeneration and he was hopeful that things would calm down eventually.  *Id.*  He recommended physical therapy and epidural steroid injections.  *Id.*

On November 28, 2012, Dr. Kravanya completed a medical source statement of Plaintiff's physical capacity, indicating that Plaintiff could lift and/or carry no weight due to her degenerative osteoarthritis of her shoulders, spine and hands, as well as her obesity and chronic pain syndrome.  Tr. at 541.  She further opined that Plaintiff could not sit, stand and/or walk for any hours per day due to degenerative osteoarthritis of her knees and feet, obesity, chronic pain syndrome and gouty arthritis, and degenerative lumbar-sacral disease, spondylosis, foraminal encroachment and radiculitis. *Id*.  Dr. Kravanya further concluded that Plaintiff could never or rarely climb, balance, stoop, crouch, kneel or crawl due to her gait abnormality, imbalance, limited range of motion in her spine, knees and feet, obesity and gouty arthritis. *Id*.

As to reaching, handling, feeling and manipulating objects, Dr. Kravanya opined that Plaintiff could occasionally perform these activities, but she could never or rarely push or pull objects due to her inability to perform repetitive or sustained movements because of the swelling and stiffness of her hands, wrists and feet and the weakness of her upper extremities.  Tr. at 542.

-7-

She also opined that Plaintiff had restrictions on being near heights, moving machinery, temperature extremes, chemicals, dust, noises and fumes because of her postural imbalance, slow gait, weight-bearing problems, heat and cold sensitivity of the joints, chronic pain affecting her mood and emotions and her sleep apnea. *Id*. When asked about a need to rest for periods of time during the workday, Dr. Kravanya responded that this question did not apply because Plaintiff was unable to perform work activities. *Id*. She indicated that a cane, walker, brace and breathing machine had been prescribed to Plaintiff and she would need a sit/stand at will option. *Id*. Dr. Kravanya opined that Plaintiff's uncontrolled hypertension, sleep disorder with secondary fatigue factor, severe pain which interferes with concentration and focus, gouty arthritis, and pain indications with secondary drowsiness, would interfere with Plaintiff's ability to work eight hours per day, five days per week. *Id*.

## B.  TESTIMONIAL EVIDENCE

At the ALJ hearing held on December 18, 2012, Plaintiff testified that she was born on January 25, 1960 and lived with her husband. Tr. at 52. She related that she had a driver's license but had not driven in a year, and her husband had driven her to the hearing. *Id*. She explained that her husband prepares meal, washes dishes, does the laundry, goes grocery shopping and helps her with her personal hygiene. *Id*. at 53-54. She can vacuum a little and can go into a store for about five minutes. *Id*. at 54. She related that she basically stays in the house laying down and watching television. *Id*. at 55. She wakes up at 4:00 a.m. or 5:00 a.m. because she hardly ever sleeps, but she goes back to bed within an hour and just lies there watching television because of the pain. *Id*. at 55-56.

Plaintiff testified that the last time she worked was for one week in 2010 and prior to that four years before. Tr. at 57. Her longest job began in 1998 as an appointment setter, but she indicated that she could no longer perform such work because of her knee, leg and back pain that prevented her from sitting and her shoulder pain which prevented her from holding a phone. *Id*. at 59-61. Since the last ALJ decision, Plaintiff remarked that her pain has increased in frequency and severity in her shoulders, knees, back, feet and toes. *Id*. at 62. She explained that she initially told doctors that the CPAP machine was helping her sleep, but then she started getting congestion,

choking and waking up at night from the CPAP effects.  *Id*. at 63.  She also explained that she refused injections because they would not help long-term and she would have to return often to try to alleviate the pain each time.  *Id.*  Plaintiff also indicated that an orthopedic doctor prescribed her a cane in 2009 due to her knee pain and they told her that she could not walk without it because she had no cartilage left in her knees.  *Id*. at 64-65.  She also testified that she uses crutches all day at home and they were also prescribed for her in 2009*.  Id.* at 65.  She indicated that she also uses a walker, orthotics, and a brace intermittently for her foot, her legs and her knee.  *Id.*

**III.**     **SUMMARY OF THE RELEVANT PORTIONS OF THE ALJ'S DECISION**

In her decision, the ALJ first noted that a prior ALJ had denied Plaintiff social security benefits in a decision dated February 26, 2011 for the impairments of obstructive sleep apnea, bilateral knee osteoarthritis, hypertension and obesity.  *Id.* at 31.  The current ALJ indicated that she was bound by the prior ALJ's findings unless a change in Plaintiff's condition had occurred. *Id*., citing *Drummond v. Comm'r of Soc. Sec*., 126 F.3d 837 (6th Cir. 1997) and  *Dennard v. Sec'y of Health & Human Servs.*, 907 F.2d 598 (6th Cir. 1990); and Acquiescence Rulings ("AR") 98-3(b) and 98-4(6).

The current ALJ found that because the prior ALJ decision was administratively final, the earliest that she could find Plaintiff disabled in the instant case would be February 26, 2011, the day after the date of the prior ALJ decision.  Tr. at 32.  Thus, the current ALJ began her consideration of the evidence beginning primarily on February 26, 2011.  *Id*.  Noting the prior ALJ's decision, the current ALJ first found that Plaintiff had not engaged in substantial gainful activity since July 7, 2007, the alleged onset date.  *Id.* at 34.  The current ALJ determined that Plaintiff suffered from the following severe impairments: obstructive sleep apnea; bilateral knee osteoarthritis; lumbar spine osteoarthritis; bilateral shoulder degenerative joint disease ("DJD"); hypertension; and obesity.  *Id*.  The current ALJ noted that while the prior ALJ did not identify degenerative disc disease as a severe impairment, new and material evidence supported such a finding in her decision.  *Id*.

Continuing, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the

Listings.  ECF Dkt. #9 at 36.  She specifically considered Listings 1.02, 1.04 and 3.10, as well as Plaintiff's obesity in conjunction with the Listings.  *Id.* at 36-37.  The ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), except that she would have to alternate between sitting and standing every hour for approximately 5 minutes without leaving her workstation.  *Id.* at 37. Additionally, the ALJ found that Plaintiff: could occasionally climb ramps and stairs, but never climb ladders, ropes or scaffolds; she could occasionally bend and balance, but never crouch, crawl or squat; she could only occasionally reach overhead, but she could frequently handle, finger and feel; and could have no concentrated exposure to pulmonary irritants; could not work around hazardous conditions; and she would require the use of a cane when standing and walking.  *Id.*

Next, the ALJ found that with the RFC that she determined, Plaintiff could perform her past relevant work as a telemarketer and an appointment setter.  ECF Dkt. #9 at 42-43.  The ALJ consequently concluded that Plaintiff was not under a disability for social security purposes and was not entitled to DIB or SSI.  *Id.* at 43.

## IV.    STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to social security benefits.  These steps are:

1.    An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2.    An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3.    If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4.    If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5.    If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including

-10-

> age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

**V.      STANDARD OF REVIEW**

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards.  *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation omitted)).  Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance."  *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007).  Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled.  The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001).  However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (internal citations omitted).

-11-

## VI.    LAW AND ANALYSIS

### A.    STEP 3 AND LISTING 1.04A

Plaintiff first asserts that the medical evidence established that her severe knee impairment meets Listing 1.02A and her severe knee impairment, combined with her obesity, right foot impairment and low back pain, medically equal Listing 1.02A.  ECF Dkt. #14 at 9-12.  Plaintiff reviews the medical evidence which she alleges supports a finding that her conditions meet or medically equal Listing 1.02A.

The undersigned first notes that the scope of this Court's review is limited to determining whether the Commissioner applied the correct legal standards and whether substantial evidence supports the findings of the Commissioner.  *Abbott*, 905 F.2d at 922.  This Court cannot reverse the ALJ's decision if it is supported by substantial evidence, even if substantial evidence exists that would have supported an opposite conclusion.  *Walters*, 127 F.3d at 528.  Accordingly, the standard of review is not whether the medical evidence in the record establishes that Plaintiff met or equaled Listing 1.02A, but whether the ALJ employed the proper legal standards in determining that her conditions did not meet or medically equal Listing 1.02A and whether substantial evidence supports that determination.

The Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 describes impairments for each of the major body parts that are deemed of sufficient severity to prevent a person from performing gainful activity.  20 C.F.R. §§ 404.1520, 416.920.  In the third step of the analysis to determine a claimant's entitlement to social security benefits, it is the claimant's burden to bring forth evidence to establish that her impairments meet or are medically equivalent to a listed impairment.  *Evans v. Sec'y of Health & Human Servs*., 820 F.2d 161, 164 (6th Cir. 1987).  In order to meet a listed impairment, the claimant must show that her impairments meet all of the requirements for a listed impairment.  *Hale v. Sec'y,* 816 F.2d 1078, 1083 (6th Cir. 1987).  An impairment that meets only some of the medical criteria and not all does not qualify, despite its severity.  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

An impairment or combination of impairments is considered medically equivalent to a listed impairment "* * *if the symptoms, signs and laboratory findings as shown in medical evidence are at least equal in severity and duration to the listed impairments." *Land v. Sec'y of Health and Human Servs.*, 814 F.2d 241, 245 (6th Cir.1986)(per curiam). Generally, an ALJ should have a medical expert testify and give his opinion before determining medical equivalence. 20 C.F.R.§§ 404.1526(c), 416.926(c). In order to show that an unlisted impairment or combination of impairments is medically equivalent to a listed impairment, the claimant "must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Sullivan*, 493 U.S. at 531.

Listing 1.02A provides:

> 1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;

Listing 1.02A. Listing 1.00B2b provides:

> B. Loss of function.

>> 1. General. Under this section, loss of function may be due to bone or joint deformity or destruction from any cause; miscellaneous disorders of the spine with or without radiculopathy or other neurological deficits; amputation; or fractures or soft tissue injuries, including burns, requiring prolonged periods of immobility or convalescence. The provisions of 1.02 and 1.03 notwithstanding, inflammatory arthritis is evaluated under 14.09 (see 14.00D6). Impairments with neurological causes are to be evaluated under 11.00ff.

>> 2. How We Define Loss of Function in These Listings

>>> a. General. Regardless of the cause(s) of a musculoskeletal impairment, functional loss for purposes of these listings is defined as the inability to ambulate effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment, or the inability to perform fine and

-13-

gross movements effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment. The inability to ambulate effectively or the inability to perform fine and gross movements effectively must have lasted, or be expected to last, for at least 12 months. For the purposes of these criteria, consideration of the ability to perform these activities must be from a physical standpoint alone. When there is an inability to perform these activities due to a mental impairment, the criteria in 12.00ff are to be used. We will determine whether an individual can ambulate effectively or can perform fine and gross movements effectively based on the medical and other evidence in the case record, generally without developing additional evidence about the individual's ability to perform the specific activities listed as examples in 1.00B2b(2) and 1.00B2c.

b. What We Mean by Inability To Ambulate Effectively

(1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

Listing 1.00B2b.

In her decision, the ALJ specifically addressed Listing 1.02A and found that Plaintiff's "degenerative joint disease of the bilateral shoulders, knees, and feet fails to met or medically equal Listing 1.02A of the Appendix 1 impairments." Tr. at 36. She explained that the medical

-14-

record failed to show a gross anatomical deformity as required by the Listing and the Listing's additional requirements of chronic joint pain and stiffness with signs of limitation of motion and a medical finding of narrowing, bony destruction, or ankylosis of the affected joints. *Id.* The ALJ further found that the medical evidence failed to establish that Plaintiff had an inability to ambulate effectively as while she used a cane, she denied the consistent need to use the cane that would limit the use of both upper extremities or otherwise interfere in her basic daily living activities. *Id.*

Defendant focuses on the ALJ's finding that the medical evidence failed to establish that Plaintiff had an inability to ambulate effectively as required by Listing 1.02A. ECF Dkt. #17 at 9. Defendant asserts that the ALJ's determination of this issue was correct and supported by substantial evidence. The undersigned recommends that the Court find that the ALJ employed the proper standards in determining that Plaintiff's impairments did not meet Listing 1.02A and substantial evidence supports that determination.

In addition to requiring the involvement of one major peripheral weight-bearing joint, which includes a knee, Listing 1.02A also requires the involvement of that one major peripheral weight-bearing joint to result in an inability to ambulate effectively, as defined in 1.00B2b. Listing 1.02A. The inability to ambulate effectively as defined by Listing 1.00B2b requires that a claimant have insufficient lower extremity functioning to allow independent ambulation without the use of a hand-held assistive device(s) that "limits the functioning of *both* upper extremities." Listing 1.00B2b (emphasis added). While Plaintiff in this case uses a cane, the "use of a single cane does not establish that plaintiff is unable to ambulate effectively for purposes of meeting or medically equaling Listing 1.02A. *See* 20 C.F.R. Pt. 404, Subpart P, App. 1, § 1.00B2b(1), (2) (ineffective ambulation is found where a claimant's use of a hand-held assistive device limits the functioning of both upper extremities, such as requiring a walker or two canes to walk)." *Rainey-Stiggers v. Comm'r of Soc. Sec.*, 2015 WL 729670, at *6 (S.D. Ohio Feb. 19, 2015), citing *Jackson v. Comm'r of Soc. Sec.*, No. 07–14184, 2009 WL 612343, at *3 (E.D.Mich. Mar.6, 2009).

-15-

In finding that the medical evidence failed to establish that Plaintiff had met the inability to ambulate requirement, the ALJ explained that while Plaintiff used a cane over the past three years to ambulate, she denied that she consistently needed an assistive device that would limit the use of both upper extremities or otherwise interfere with her basic daily activities.  Tr. at 36.  Substantial evidence supports the ALJ's determination as Plaintiff did not meet her burden of showing that her use of a cane limited the functioning of both of her upper extremities.  And while Plaintiff did testify that she used crutches at home, she testified that she used a cane when walking outside.  Tr. at 64-65.  She also testified that while she was prescribed a brace for her foot and her knee, she only used them from time to time.  *Id*. at 65.  Accordingly, the undersigned recommends that the Court find that the ALJ used the proper standards in determining that Plaintiff's impairments did not meet or medically equal Listing 1.02A and substantial evidence supports that determination.

### B.        TREATING PHYSICIAN'S OPINIONS

If an ALJ decides to discount or reject a treating physician's opinion, she must provide "good reasons" for doing so.  SSR 96-2p.  The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.*  This allows a claimant to understand how her case is determined, especially when she knows that her treating physician has deemed her disabled and she may therefore "'be bewildered when told by an administrative bureaucracy that [s]he is not, unless some reason for the agency's decision is supplied.'" *Wilson,* 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999)).  Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.*  If an ALJ fails to explain why she rejected or discounted the opinions and how those reasons affected the weight afforded to the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243 (citing *Wilson*, 378 F.3d at 544).

-16-

The Sixth Circuit has noted that, "while it is true that a lack of compatibility with other record evidence is germane to the weight of a treating physician's opinion, an ALJ cannot simply invoke the criteria set forth in the regulations if doing so would not be 'sufficiently specific' to meet the goals of the 'good reason' rule." *Friend v. Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *8 (6th Cir. Apr.28, 2010).  The Sixth Circuit has held that an ALJ's failure to identify the reasons for discounting opinions, "and for explaining precisely how those reasons affected the weight" given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Parks v. Social Sec. Admin.*, No. 09-6437, 2011 WL 867214, at *7 (6th Cir. March 15, 2011) (quoting *Rogers*, 486 F.3d at 243 ).  However, an ALJ need not discuss every piece of evidence in the administrative record so long as she considers all of a claimant's medically determinable impairments and the opinion is supported by substantial evidence. *See* 20 C.F.R. § 404.1545(a)(2); *see also Thacker v. Comm'r of Soc. Sec.*, 99 Fed.Appx. 661, 665 (6th Cir.2004). Substantial evidence can be "less than a preponderance," but must be adequate for a reasonable mind to accept the ALJ's conclusion. *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir.2010) (citation omitted).

In the instant case, Plaintiff challenges the ALJ's decision to afford less than controlling weight to the opinions of Dr. Kravanya.  ECF Dkt. #14 at 12-17.  Again, the issue is not whether substantial evidence supports a finding contrary to that of the ALJ; rather, the issue is whether the ALJ properly applied the law and whether substantial evidence supports her determination, even if evidence exists to the contrary.  This Court cannot reverse the ALJ's decision if it is supported by substantial evidence, even if substantial evidence exists that would have supported an opposite conclusion.  *Walters*, 127 F.3d at 528.

The ALJ cited to Dr. Kravanya's February 24, 2012 "To Whom it may Concern" letter opining that Plaintiff was not a qualified candidate for employment due to her advancing degenerative osteoarthritis in the shoulders, knees, spine and feet, her use of a cane, and her severe obesity.  Tr. at 41, citing Tr. at 489.  The ALJ also cited to Dr. Kravanya's November 28, 2012 functional capacities form for Plaintiff where she found that Plaintiff could never lift or

-17-

carry objects, never sit or stand/walk and rarely perform postural activities.  Tr. at 41, citing Tr. at 541.  The ALJ cited to SSR 96-02p in evaluating Dr. Kravanya's opinions and found that the opinions were not entitled to controlling weight.  Tr. at 41.

The ALJ first explained that Dr. Kravanya's conclusion that Plaintiff was not qualified for employment was a decision for the ALJ and not Dr. Kravanya.  *Id*.  The ALJ is correct.  A medical source's statement on an issue reserved for the Commissioner, such as an assertion that a claimant is "disabled" or "unable to work," is a legal conclusion and not a medical opinion. 20 C.F.R. § 416.927(e). Such statements are not entitled to any special significance. 20 C.F.R. § 416.927(e)(3). "The determination of disability is ultimately the prerogative of the Commissioner, not the treating physician." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir.2004).

The ALJ then indicated that the severe limitations opined by Dr. Kravanya would essentially confine Plaintiff to her bed because she would not be able to perform any activity for any more than a few minutes, which was not consistent with the findings of physicians who found that Plaintiff had full strength and functional ranges of motion.  Tr. at 38.  The ALJ also indicated that such severe limitations were not consistent with Plaintiff's daily activities.  *Id*.  The ALJ thus concluded that she was attributing little weight to Dr. Kravanya's opinions and giving significant weight to the opinions of agency examiners and consultants.  *Id*. at 41-42.

In applying the treating physician rule and attributing little weight to Dr. Kravanya's opinions, the ALJ cited to the relevant regulations and Social Security Rulings concerning the evaluation of treating physician and other physician opinions.  Tr. at 41, citing 20 C.F.R. §§ 404.1527, 416.927, SSRs 96-2p, 96-5p, 96-6p, 06-3p.  She then reviewed the objective medical evidence concerning each of Plaintiff's impairments, including that which showed mid-foot arthritis, great toe osteoarthritis, bilateral pes planus deformities, a plantar calcaneal spur, knee osteoarthritis and lumbar disc space narrowing and osteophyte formation with moderate to severe degenerative changes at L4-L5 and mild changes at L3-L4.  Tr. at 38-39.  The ALJ also

considered Plaintiff's obesity and Dr. Kravanya's report in December of 2011 which showed muscle spasms and decreased lumbar range of motion. *Id.* at 39, citing Tr. at 493.

While considering these objective medical findings and Dr. Kravanya's severely limiting opinions, the ALJ found them inconsistent with Plaintiff's conservative treatment for her impairments.  Tr. at 38.  The ALJ noted that Plaintiff used only orthotic devices for her foot conditions and no further complaints about her feet were documented after April 2012.  Tr. at 38, citing Tr. at 518-519.  Dr. Miskovsky, the orthopedic doctor who treated and diagnosed Plaintiff's foot impairments in April 2012, reinforced to Plaintiff the need for her to lose weight as she told Plaintiff that any weight loss would be extremely helpful to those conditions.  *Id.* at 518.  Dr. Miskovsky recommended that Plaintiff wear a cam walker boot for three weeks for standing and walking, perform stretching exercises for her feet, and then transition into the custom orthotics that were made for her.  *Id.*  Moreover, Dr. Kravanya did not identify Plaintiff's foot conditions in her November 28, 2012 physical capacity evaluation for Plaintiff which opined severe limitations.  *Id.* at 541-542.  Despite the conservative treatment and lack of further findings and complaints after April of 2012, the ALJ noted the objective findings concerning Plaintiff's feet and limited her to sedentary work with no crouching, kneeling or crawling.  *Id.* at 38.  She also noted that a lack of weakness and lack of decreased reflexes weighed against a finding of restrictions on the use of foot controls.  *Id.* at 38-39, 517.

The ALJ also addressed Plaintiff conservative treatment for her knee osteoarthritis.  Tr. at 38.  She reviewed the medical evidence concerning Plaintiff's knee impairments, including x-rays showing degenerative changes with joint space narrowing, subchondral sclerosis and marginal osteophytosis and mild patellofemoral degenerative changes.  *Id.*, citing Tr. at 466-468, 535-536.   The ALJ also reviewed the findings of orthopedic specialist Dr. Fitzgerald, who observed that Plaintiff had an antalgic gait and used a cane or crutches to ambulate.  *Id.*, citing Tr. at 537-538.  Further, the ALJ noted that Dr. Kravanya had documented Plaintiff's complaints of knee pain, swelling and stiffness in September of 2011 and found decreased knee range of motion and lower extremity strength.  *Id.*, citing Tr. at 489.

-19-

However, in finding Plaintiff not as severely limited as Dr. Kravanya opined, the ALJ noted that Dr. Fitzgerald's clinical findings showed that Plaintiff had only mild effusion and diffuse tenderness, with good stability and a functional range of motion. Tr. at 38, citing Tr. at 537. The ALJ also noted no additional record evidence showed weakness, muscle atrophy or decreased reflexes. Tr. at 38. She cited to the findings of Dr. Beecher, an orthopedic doctor who examined Plaintiff on November 24, 2010 and found that she had full strength and a functional range of motion in her knees. *Id.*, citing Tr. at 432. The ALJ also noted that Plaintiff had treated only with NSAIDs for most of the relevant time period despite her allegations of debilitating pain, and she refused injections or nerve blocks, rarely used a knee brace prescribed for her, and did not maintain a reasonable level of activity as recommended by her doctors. Tr. at 39, citing Tr. at 63, 66, 358-359, 432. The ALJ relied upon these findings to support her determination that Plaintiff was not limited beyond her finding that Plaintiff could perform sedentary work with a sit/stand option, occasional climbing of ramps and stairs, no climbing of ropes, ladders or scaffolds, occasional bending and balancing, no crouching, crawling or squatting and no working around hazardous conditions. *Id.* at 38-39.

The ALJ also addressed Plaintiff's back impairments, citing to the lumbar spine x-rays that showed disc space narrowing and osteophyte formation at L3-L4, L4-L5, and L5-S1, moderate to severe degenerative changes at L4-L5, and mild changes at L3-L4. Tr. at 39, citing Tr. at 488, 529. The ALJ found these degenerative changes consistent with a functional capacity limitations to sedentary work with limited postural activities and a sit/stand option. *Id.* at 39. In support of this finding, the ALJ noted that while Dr. Kravanya opined that Plaintiff was disabled in part due to her back impairment and she had noted tenderness to palpation, muscle spasms and decreased range of lumbar motion upon examination in December of 2011, it was reported that medication helped with Plaintiff's mobility and Dr. Eubenks, an orthopedic specialist, had examined Plaintiff in April 2012 and found a normal neurologic examination, negative straight leg raising, full strength in the lower extremities and no pain with range of motion in her hips. *Id.*, citing Tr. at 533-534, 539-540, 541. Dr. Eubenks noted that Plaintiff had no radiating pain, no numbness or tingling, and she had no physical therapy or epidural

steroid injections for her back pain.  *Id*. at 533-534, 539-540.  He recommended both and Plaintiff began with physical therapy.  *Id*. at 533.

The ALJ also addressed Plaintiff's sleep apnea, asthma, hypertension, obesity and her shoulder impairment.  Tr. at 39-40.  She noted that Plaintiff's reports that her sleep apnea greatly improved with the use of a CPAP machine, although Plaintiff complained of nasal burning and irritation for which doctors recommended the use of saline drops.  *Id*. at 40, citing Tr. at 343, 353, 358-359, 407-408, 420, 429.  The ALJ noted Plaintiff's noncompliance with the use of saline drops and the records show occasional noncompliance with the CPAP as well.  Tr. at 40, citing Tr. a 343, 353, 373-374, 407-408.  The ALJ also reviewed evidence concerning Plaintiff's asthma and hypertension, finding that these conditions, combined with Plaintiff's sleep apnea, required limitations to pulmonary irritants and exposure to hazards.  *Id*. at 40.  The ALJ noted that she had also considered Plaintiff's morbid obesity as her weight was likely to contribute to her body pain and restricted movements and Plaintiff's doctors had emphasized that she needed to lose weight.  *Id*. at 39.   The ALJ reviewed evidence regarding Plaintiff's painful shoulders, finding that while a clinical examination showed decreased range of motion in the shoulders, x-rays showed only mild degenerative changes and examination revealed full upper extremity strength.  *Id*. at 40.  The ALJ gave Plaintiff the benefit of the doubt as to this condition and limited her ability to reach overhead to occur only occasionally. *Id.*

In addition to reviewing the medical evidence concerning each of Plaintiff's impairments, the ALJ also evaluated Plaintiff's credibility and her daily living activities, finding that while Plaintiff's impairments caused significant restrictions in Plaintiff's abilities to perform many daily tasks, they did not prevent her from performing sedentary work with the additional limitations that the ALJ determined.  Tr. at 40.  The ALJ noted a discrepancy in Plaintiff's testimony that she spent almost all of her time lying down with Plaintiff's acknowledgment in her adult function report that she performed household chores twice a week, went grocery shopping and used public transportation, and Plaintiff's report to a psychological

examiner that she spent most of her time sitting and watching television rather than lying down. *Id.*, citing Tr. at 250-256, 477-478.

The ALJ also cited to the opinions of the state agency physicians who opined in June 2011 that Plaintiff was capable of light work with limited overhead reaching.  Tr. at 41, citing Tr. at 102-107, 117-131.  The ALJ found that while she attributed significant weight to the opinions of these agency physicians, she nevertheless limited Plaintiff to sedentary and not light work based upon evidence of increasing lower extremity and low-back symptoms and the requirements of *Drummond* and the prior ALJ's RFC for Plaintiff.  *Id.*

The undersigned recommends that the Court find that the above outline of the ALJ's decision more than demonstrates that the ALJ properly applied the treating physician rule and substantial evidence supports her decision to attribute less than controlling weight to Dr. Kravanya's extreme opinions.   The ALJ reviewed the medical evidence and findings, cited to the appropriate regulations and social security rulings in evaluating the opinion evidence, and adequately articulated her reasons for the weight that she gave to Dr. Kravanya's opinions, which were supported by the evidence of record.  Moreover, the undersigned recommends that the Court find that the ALJ's decision to attribute less than controlling weight to Dr. Kravanya's opinions is supported by substantial evidence as the ALJ cited to medical and non-medical evidence that supported her decision to attribute little weight to Dr. Kravanya's extreme limitations.

## VII.   RECOMMENDATION AND CONCLUSION

For the foregoing reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and DISMISS the instant case with prejudice.

DATE: February 5, 2016                        */s/George J. Limbert*
                                              GEORGE J. LIMBERT
                                              UNITED STATES MAGISTRATE JUDGE

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. L.R. 72.3(b).